IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM DUKES

    Plaintiff,

  vs.                            Case No.

CHICAGO POLICE SERGEANT
JAMES WASHBURN, # 20372
CHICAGO POLICE DETECTIVE
ROLANDO RODRIGUEZ, # 20751
CICERO POLICE DETECTIVE DARLENE
SOBCZAK, # 123
CICERO POLICE DETECTIVE ROBERT
DONEGAN, #488
CICERO POLICE DETECTIVE ALLAN
PINEDA, #496
COOK COUNTY STATES ATTORNEY
INVESTIGATOR BRIAN KILLACKY, #361
COOK COUNTY STATES ATTORNEY KIM FOXX
CITY OF CHICAGO,
CITY OF CICERO

    Defendants.                  JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES the Plaintiff, WILLIAM DUKES by and through his attorneys Stephen L. Richards and Joshua S.M. Richards and makes the following complaint against Defendants CHICAGO POLICE SERGEANT JAMES WASHBURN, # 20372, CHICAGO POLICE DETECTIVE ROLANDO RODRIGUEZ, # 20751, CICERO POLICE DETECTIVE DARLENE SOBCZAK, # 1123, CICERO POLICE DETECTIVE ROBERT DONEGAN, #488. CICERO POLICE DETECTIVE ALLAN PINEDA, #496, COOK COUNTY STATES

ATTORNEY INVESTIGATOR BRIAN KILLACKY, #361, COOK COUNTY STATES ATTORNEY KIM FOXX, CITY OF CHICAGO, CITY OF CICERO.

In support thereof, WILLIAM DUKES states as follows:

### JURISDICTION

1. This action is brought pursuant to 42 U.S.C. Sec. 1983 to redress the deprivation of law of William Dukes's civil rights as secured by the United States Constitution.

2. This court has jurisdiction of the action pursuant to 28 U.S.C. Secs. 1331, 1343, 1367.

### VENUE

3. Venue is proper under 28 U.S.C. Sec. 1391(b).

### PARTIES

4. Plaintiff William Dukes is a male person who is a United States Citizen and a resident of Cook County, Illinois.

5. Chicago Police Sergeant James Washburn is and at all times relevant to this suit a detective in the Chicago Police Department. His star number is 20372. He is sued in his individual capacity.

6. Chicago Police Detective Rolando Rodriguez is and at all times relevant to this suit a detective in the Chicago Police Department. His star number is # 20751. He is sued in his individual capacity.

7. Cicero Police Detective Darlene Sobczak was at all times relevant to this suit a detective in the Cicero Police Department. Her star number is #1123. She is sued in her individual capacity.

8. Cicero Police Detective Robert Donegan was at all times relevant to this suit a detective in the Cicero Police Department. His star number is #488. He is sued in his individual capacity.

9. Cicero Police Detective Allan Pineda was at all times relevant to this suit a detective in the Cicero Police Department. His star number is #496. He is sued in his individual capacity.

10. Cook County States Attorney Investigator Brian Killacky was at all times relevant to this suit was investigator with the Cook County States Attorney Office. His star number is #361. He is sued in his individual capacity.

11. Cook County States Attorney Kim Foxx, is the County City Of Chicago, City Of Cicero.

12. Defendant City of Chicago is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

13. Defendant City of Cicero is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

## FACTUAL ALLEGATIONS

*Procedural History*

14. On April 14, 2004, William Dukes was arrested and charged with two murders, as well as home invasion residential burglary, attempt robbery and aggravated criminal sexuala assault.

15. On May 6, 2004, William Dukes was indicted for two murders, along with charges of home invasion, residential burglary, attempt robbery, and aggravated criminal sexual assault.

16. On William Dukes was convicted after a jury trial of two murders. On April 23, 2012, he was sentenced to life imprisonment.

17. On November 4, 2014, the Illinois appellate court reversed William Dukes's conviction and remanded the case for a new trial. People v. Dukes, 2014 IL App 121541, ¶ 2 ( 2014) (Exhibit One).

18. On July 11, 2019, William Dukes was found not guilty after a bench trial, and released from custody.

19. William Dukes spent 5566 days in custody, or 15 years and 91 days.

*Evidence at the First Trial*

20. The following evidence was adduced against William Dukes at his first trial.

21. Marilyn Williams owned a house in Cicero. In the summer of 1993, she lived upstairs in the house with her daughter Lucy and Lucy's two children, Dustin, then 2 years old, and Bridget, who was 8. Marilyn rented part of the first floor to Marko Tomazovich.

22. Sometime that summer Marilyn met plaintiff William Dukes . She leased a second unit on the first floor to Dukes for about two months. Lucy briefly engaged in a sexual relationship with Dukes that summer.

23. On July 23, 1993, Lucy told William Dukes that she was going to marry her longtime boyfriend, Kevin Rhynes, the next day. Dukes wished her good luck. Lucy had sex with Dukes that night and married Kevin at the courthouse the next day. Lucy and her children moved into Kevin's home, and Dukes moved out of Marilyn's house soon thereafter.

24. Tomazovich had a severe problem with substance abuse and addiction. Tomazovich's father helped him pay the rent, but by the summer of 1993, Tomazovich's father decided to stop giving Tomazovich money, and Tomazovich stopped paying rent.

25. Lucy handed Tomazovich an eviction notice for failure to pay the rent. Marilyn and Lucy told Tomazovich they just wanted him to move out. He said, "Fuck you, bitches; I ain't paying." Later, Tomazovich said to Marilyn, "One day, I'm going to get you when you're alone. You better watch your back. I'm going to kill you."

26. On August 28, 1993, Lucy left Bridget and Dustin with Marilyn while Lucy went to work her shift as a cocktail waitress from 5 p.m. until closing. She went to Marilyn's home the next morning.

27. Lucy found the front door ajar, and then she saw Dustin sleeping on a couch. Lucy found Marilyn and Bridget in the bathtub, dead. She picked up the telephone but heard no dial tone. She went down to Tomazovich's unit and banged on the door. When he answered, she told him to call 911. Tomazovich came upstairs with her and then went to a neighbor's home to call police.

28. The medical examiner found that Bridget died when someone tied a ligature around her neck and cut off her air. Tears on her vagina indicated that she had been raped shortly before her death. Marilyn died from suffocation. Her head bore marks showing the result of blunt force trauma shortly before death.

29. Police recovered a blood-soaked comforter from Marilyn's home. The police laboratory's tests showed that the blood matched Bridget's blood. Police also found several hairs on the comforter. From Tomazovich's unit, police obtained a bloody t-shirt and bloody jeans. Laboratory tests indicated that the blood matched Tomazovich and not Bridget or Marilyn.

30. In an initial interview on August 29, 1993, Tomazovich told defendant Cicero police detective Darlene Sobczak that he knew nothing about the murders. He told Sobczak that he bled on his shirt and jeans in a fight at a bar. He also said he bled on the clothes during a fight in the woods.

31. In October 1994, police arrested Tomazovich for two robberies. Tomazovich pled guilty and the court sentenced him to six years in prison.

32. In March 1995, Sobczak again interviewed Tomazovich about the murders of Marilyn and Bridget because he remained a suspect in the case. Tomazovich again said he knew nothing about the murders. But he changed his story when Sobczak interviewed him in August 1995. Tomazovich then said that he watched while Dukes murdered Marilyn and raped and murdered Bridget.

33. Police arrested Dukes in August 1995. Officers found part of Lucy's drivers license in Dukes's wallet. Dukes told Sobczak he knew nothing about the murders, and he had not

gone to Marilyn's house on the night of the murders. Police released Dukes without charging him.

34. Police arrested Tomazovich again in 1998. Again police asked him about the murders. This time, Tomazovich said that he held Marilyn's legs while Dukes choked her. Prosecutors charged Tomazovich with the murders of Marilyn and Bridget.

35. Five years later, in October 2003, Tomazovich agreed to plead guilty to home invasion and to testify against Dukes in exchange for the dismissal of charges against him for the murders of Marilyn and Bridget.

36. Also in October 2003, defendant Brian Killacky acting under cover tried to induce Dukes to confess to the murders. The officer did not succeed. Instead, officers arrested Dukes on drug charges in January 2004.

37. William Dukes was arrested on January 9, 2004 and questioned for approximately 36 hours.

38. On January 10, 2004, defendant Washburn questioned Dukes. According to Washburn, he asked what type of sentence Dukes thought he could get for a double homicide and Dukes said replied: "the needle."

39. Washburn claimed that Dukes then said he wanted to tell Washburn about his participation in the murders of Marilyn and Bridget. First, Dukes wanted to make some phone calls.

40. Washburn claimed that after the calls, Dukes said he would make a statement about his participation in the murders if the State promised not to seek the death penalty. Washburn said he needed to speak to his supervisor. When he returned, Washburn said, "State's Attorney's office wants to know exactly what you're going to say in your

statement regarding the murders." Washburn claimed that Dukes said, "[W]ell, I'm going to tell them about my participation in the murders of Marilyn and Bridget." Washburn asked, "What are you going to say? That you killed Marilyn and Bridget?" Dukes answered, "[Y]es, yes, I am."

41. Before trial, Dukes filed a motion to suppress the discussions he had with Washburn, and Cook County Assistant States Attorney Papa, as plea negotiations. The trial court denied the motion in pertinent part.

42. At the jury trial, the State presented an expert on hair comparison, who testified that two hairs found on the blood-soaked comforter appeared to be pubic hairs. Those hairs matched Dukes's hair, and they did not match Tomazovich's hair or the other hair samples police took, including hairs of Marilyn and Bridget.

43. The expert also looked at other hairs from the comforter, and found the hairs did not match Dukes, Tomazovich, Marilyn, Bridget, or any other hair samples prosecutors asked the expert to compare to the hairs from the comforter. The expert admitted that nothing about the hairs indicated when or how the hair arrived at the comforter, and she did not conclude from the unidentified hairs that other persons participated in the crimes.

44. The expert admitted that Bridget or Marilyn or anyone else who came to their home could have picked up the unidentified hairs anywhere outside the home and carried them to the comforter. The expert also admitted that Dukes's hair could have gotten on the comforter when he lived in the house and sometimes visited Lucy.

45. An expert on DNA comparisons compared the DNA from the two hairs from the comforter to Dukes's DNA. He found that the DNA matched at two loci, and he

estimated that about one Caucasian person in 1300 would match the hair's DNA at those two loci.

46. Defendant Washburn testified about the January 10, 2004, interview with Dukes. After the prosecution elicited all of the statements the trial court permitted, defense counsel, on cross-examination, elicited Washburn's testimony that Dukes sought a sentence of 20 years, and a sentence of 40 years, in exchange for his statement.

47. Defendant Sobczak testified that when she questioned Dukes in 1995, she asked him about his relationship with Lucy. According to Sobczak, Dukes "kept on and on about how she liked rough sex, and that they wanted each other and he would have sex with her and she wanted him and little detail like about roughness and stuff of sex."

48. When defense counsel objected, the prosecutor promised to show the relevance of the testimony to motive. The judge overruled the objection.

49. Sobczak testified that she asked Dukes why he had Lucy's picture from her drivers license in his wallet. She claimed Dukes said Marilyn asked him to stop Lucy from marrying Kevin. After Dukes had sex with Lucy the night before her wedding, Dukes took all of Lucy's identification cards, thinking that she could not complete the civil ceremony without any identification.

50. Dukes told Sobczak that on August 28, 1993, he spent the afternoon with a friend, then he went to another friend's home, then he stayed at a crack house for the night.

51. Sobczak claimed that in 2004 she found the crack house where Dukes said he stayed, and she verified that he did not spend the night there on August 28, 1993. Neither party asked Sobczak what she did, in 2004, to verify that Dukes had not spent a specific night at the crack house in 1993.

52. Lucy testified that when she arrived at the courthouse for her wedding on July 24, 1993, she found that she had no identification cards. However, she had her birth certificate, and the court accepted that as sufficient identification for the ceremony.

53. Lucy saw Dukes a few times after the wedding. He gave her back her identification cards. Another time he came into the place where she worked as a cocktail waitress. She told Dukes their relationship was over. Dukes remained calm, and he "never seemed like he was angry or any emotions actually, none." Lucy testified that she did not like rough sex, and she never said to Dukes that she liked rough sex. Dukes's attorney moved to strike as irrelevant all references to rough sex. The trial court denied the motion.

54. Tomazovich testified that he had a "love/hate" relationship with Marilyn. He explained, "We always argued and ten minutes later she would bring me down a pot of food." When they argued, he said things he did not mean. The parties stipulated that Tomazovich threatened to kill Marilyn after she and Lucy served him with an eviction notice in the summer of 1993.

55. Tomazovich extensively recounted the events of August 28, 1993. He claimed that around 10 p.m. that evening, Dukes came by Tomazovich's home with some beer. After they drank some, Dukes asked Tomazovich for money. Tomazovich said he had none.

56. Dukes suggested that they could ask Marilyn for money. Tomazovich and other persons often borrowed money from Marilyn. Tomazovich and Dukes went upstairs and Tomazovich knocked on Marilyn's door. Marilyn let him in, and agreed to give him $5.

57. When Marilyn saw Dukes behind Tomazovich, she started yelling at Dukes and Dukes yelled back. Dukes knocked Marilyn down and started choking her. Tomazovich tried

to pull Dukes off Marilyn, but Dukes swung a fist and hit Tomazovich in the head. Marilyn tried to get up, but Dukes got back on top of her and choked her. He told Tomazovich to hold Marilyn's legs. Tomazovich did so. He let go quickly, but Marilyn was quiet and not moving. Dukes rummaged through the home, apparently looking for cash.

58. Tomazovich testified that he saw Dukes carry Bridget into the bedroom. Tomazovich followed and saw that Dukes had taken Bridget's pants off. Tomazovich said, "[W]hat the fuck." Dukes hit Tomazovich in the chest. Tomazovich watched Dukes rape Bridget. Tomazovich tried to grab Bridget, and Dukes hit Tomazovich repeatedly and pushed him out of the bedroom. When Dukes came out of the quiet bedroom, he told Tomazovich to help him carry Marilyn into the bathroom. Dukes then carried Bridget into the bathroom. Dukes threatened to do the same to Tomazovich's children if Tomazovich said anything.

59. Tomazovich went downstairs to his home and took off his soiled clothes. He testified that he did not remember how he got blood on his clothes, but he thought his nose might have bled.

60. To persuade the jury that Tomazovich had not concocted his account of the murder in response to police questioning, years after the crimes took place, the prosecutor asked Tomazovich about a conversation between Tomazovich and his friend, Arlene Kwil, a few days after the murders. The jury heard the following:

"Q. What did you say to Arlene Kwil?

A. I started venting about how I couldn't help the kids out.

Q. Did you say words to the effect that you couldn't stop him?

    A. Yes.

    Q. Who were you referring to?

    A. Dukes.

    Q. A few days after that *** were you then spoken to again by the police?

    A. Yes.

    Q. Did they confront you with what *** you had told Arlene Kwiil?

    A. Right.

    Q. What did you say?

    A. I believe I told them I didn't know nothing."

61. In closing argument, the prosecutor emphasized Dukes's confession, and said that the lack of Bridget's blood on Tomazovich's clothing showed that Tomazovich told the truth.

62. The jury found Dukes guilty of the first degree murders of Marilyn and Bridget. The trial court denied Dukes's motion for a new trial and sentenced him to natural life in prison.

*Additional Facts Relating to William Dukes' Interrogation*

63. Dukes was arrested on January 9, 2004 on drugs and weapons charges.

64. He was interrogated for 36 hours, almost continuously, including a period when he was surreptitiously interrogated and recorded by defendant Brian Killacky, who was placed in Dukes's cell.

65. Dukes was also interrogated by defendants Washburn, Rodriguez, Donnegan, and Pineda.

66. Throughout the interrogation, Dukes was not given *Miranda* warnings.

67. At numerous points during the interrogation, Dukes asked for counsel, and was refused.

*Further Proceedings*

68. On appeal, the appellate court reversed and remanded for a new trial. The court found that the trial court erred when it denied Dukes's motion to suppress the statements he alleged made to defendant Washburn, because these statements were part of plea negotiations with the state, (2) the court erred when it denied references to "rough sex," and (3) the court erred when it allowed Tomazovich to testify about his conversation with Kwil.

69. On remand, Dukes waived his right to a jury trial and took a bench trial.

70. With the exception of the evidence which the appellate court said should have been excluded, consisting of William Dukes's "confession," the references to rough sex, and Tomazovich's conversation with Kwil, the parties stipulated to the evidence from the first trial.

71. On July 11, 2019, William Dukes was acquitted of all charges.

**COUNT I – VIOLATION OF DUE PROCESS BY FABRICATION OF A FALSE CUSTODIAL CONFESSION, ALLEGEDLY MADE BY WILLIAM DUKES**

**(DEFENDANTS WASHBURN AND RODRIGUEZ)**

72. William Dukes realleges all previous paragraphs and incorporate them into this count by reference.

73. Defendant Washburn, acting in concert with defendant Rodriguez, authored a fabricated police report, in which Washburn claimed that "[W]ell, I'm going to tell them about my participation in the murders of Marilyn and Bridget." Washburn falsely claimed that he

then asked, "What are you going to say? That you killed Marilyn and Bridget?" Walsh also claimed that Dukes answered, "[Y]es, yes, I am."

74. Washburn conveyed this information to the prosecutors and testified to these false statements at trial.

75. These statements were a material factor in William Dukes's conviction and deprived him of his fourteenth amendment right to due process.

**COUNT II – VIOLATION OF DUE PROCESS BY FABRICATION OF FALSE OUT OF COURT STATEMENTS ALLEGEDLY MADE BY WILLIAM DUKES (DEFENDANT SOBCZAK)**

76. William Dukes realleges all previous paragraphs and incorporates them by reference.

77. Defendant Darlene Sobczak authored a fabricated police report in which she stated that William Dukes made the following statements to her: (1) that Lucy liked "rough sex," (2) that after Dukes had sex with Lucy the night before her wedding, Dukes took all of Lucy's identification cards, thinking that she could not complete the civil ceremony, and (3) that this was an explanation as to why Dukes without any identification. and that they wanted each other and he would have sex with her and she wanted him and little detail like about roughness and stuff of sex."

78. Sobczak authored a fabricated police report in which she claimed that William Dukes gave her the address of a "crack house" as an alibi, and falsely stated that she had disproved this alibi.

79. Sobczak conveyed this information to the prosecutors and testified to these false statements at trial.

80. These statements were a material factor in William Dukes's conviction and deprived him of his fourteenth amendment right to due process.

**COUNT III – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY ELICITATION OF COERCED INVOLUNTARY STATEMENTS**

**(DEFENDANTS WASHBURN, RODRIGUEZ, DONEGAN, PINEDA, AND KILLACKY)**

81. William Dukes realleges all previous paragraphs and incorporates them by reference.

82. Any statements William Dukes made during his interrogation were involuntary, based upon the length, manner, and tone of the interrogation, the use of an undisclosed undercover officer as an interrogator, William Dukes's physical and mental condition, the use of promises and threats, the denial of counsel, and the absence of Miranda warnings.

83. Defendants Washburn, Rodriguez, Donegan, Pineda, and Killacky acting individually and in concert, denied William Dukes his fourteenth amendment due process rights by conducting the interrogation in this manner, as well as by denying him his right to counsel and failing to give him Miranda warnings.

**COUNT IV – VIOLATION OF WILLIAM DUKES'S FIFTH AND FOURTEENTH DUE PROCESS RIGHTS BY THE ELICITATION OF STATEMENTS WITHOUT GIVING OF MIRANDA WARNINGS**

**(DEFENDANTS WASHBURN, RODRIGUEZ, DONEGAN, PINEDA, AND KILLACKY)**

84. William Dukes realleges all previous paragraphs and incorporates them by reference.

85. Any statements William Dukes made during his interrogation were taken in violation of his fifth and fourteenth amendment rights when he was interrogated by defendants defendants Washburn, Rodriguez, Donegan, Pineda, and Killacky acting individually

and in concert, denied William Dukes his fourteenth amendment due process rights by interrogating him without giving him Miranda warnings.

**COUNT V – VIOLATION OF WILLIAM DUKES'S FIFTH AND FOURTEENTH DUE PROCESS RIGHTS BY IGNORING WILLIAM DUKES'S ASSERTION OF HIS RIGHT TO COUNSEL AND BY CONTINUING TO QUESTION HIM AFTER HE REQUESTED A LAWYER**

**(DEFENDANTS WASHBURN, RODRIGUEZ, DONEGAN, PINEDA, AND KILLACKY)**

86. William Dukes realleges all previous paragraphs and incorporates them by reference.

87. Any statements William Dukes made during his interrogation were taken in violation of his fifth and fourteenth amendment rights when he was interrogated by defendants Washburn, Rodriguez, Donegan, Pineda, and Killacky acting individually and in concert, after William Dukes asserted his right to counsel on numerous occasions and requested a lawyer.

**COUNT VI – INDEMINIFICATION**

**(DEFENDANT CITY OF CHICAGO)**

88. William Dukes realleges all previous paragraphs and incorporated them by reference.

89. Illinois law provides that public entities, such as defendant City of Chicago are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

90. At all relevant time, defendants Washburn and Rodriguez were agents of defendant City of Chicago and of the Chicago Police Department acting within the scope of their employment. Defendant City of Chicago, therefore, is liable as principal for all torts committed by its agents, defendants Washburn and Rodriguez.

## COUNT VII – INDEMINIFICATION

## (DEFENDANT CITY OF CICERO)

91. William Dukes realleges all previous paragraphs and incorporated them by reference.

92. Illinois law provides that public entities, such as defendant City of Cicero are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

93. At all relevant time, defendants Donegan, Pineda, and Sobczak were agents of defendant City of Cicero and of the Cicero Police Department acting within the scope of their employment. Defendant City of Cicero, therefore, is liable as principal for all torts committed by its agents, defendants Donegan, Pineda, and Sobczak.

## COUNT VIII – INDEMINIFICATION

## (DEFENDANT KIM FOXX, COOK COUNTY STATES ATTORNEY)

94. William Dukes realleges all previous paragraphs and incorporated them by reference.

95. Illinois law provides that public entities, such as defendant Kim Foxx, Cook County States Attorney, are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

96. At all relevant time, defendant Killacky was an agent of defendant Kim Foxx, Cook County States Attorney, acting within the scope of his employment. Defendant Kim City of Cicero, therefore, is liable as principal for all torts committed by her agent, defendant Killacky.

PRAYER FOR RELIEF

WHEREFORE, William Dukes requests this honorable court to grant William Dukes judgment against all defendants in a fair and just amount. Specifically William Dukes prays for both compensatory and punitive damages against all defendants in addition to costs and reasonable attorney's fees and all other relief as this court finds just and reasonable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff William Dukes demands trial by jury for all the issues pleaded.

Plaintiff, William Dukes

/s/ Stephen L. Richards

By: Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927
Sricha5461@aol.com
Attorney No: 6191946