## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WILLIAM DUKES,

Plaintiff,

v.

CHICAGO POLICE SERGEANT
JAMES WASHBURN, #20372, et al.

Defendants.

Case No. 21-cv-3672

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

This case arises from two tragic murders. In 1993, Marilyn Williams and her eight-year-old granddaughter, Lucy, were murdered. Years later, Plaintiff William Dukes was arrested, tried, and convicted for their murders in Illinois state court. After the appellate court vacated his conviction, the State re-tried Plaintiff, and the re-trial resulted in his acquittal in 2019. Up until his acquittal, Plaintiff spent 15 years and 91 days in custody. Plaintiff brings a complaint under 42 U.S.C. § 1983, alleging that the various Defendants—members of the Chicago and Cicero police forces and a State's Attorney investigator—violated his constitutional rights by fabricating evidence and coercing a false confession. Plaintiff also sues the City of Chicago, Town of Cicero, and Kim Foxx in her capacity as the Cook County State's Attorney for indemnification under state law.

Defendants have all moved to dismiss on various grounds. [29]; [34]; [40]; [55].

1

For the reasons explained below, this Court grants in part and denies in part their motions.

## I.    Background

This Court accepts as true the following facts from the complaint [4]. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

### A.    Parties

Plaintiff William Dukes resides in Cook County. [4] ¶ 4.

Defendants Washburn and Rodriguez have, at all times relevant, served as detectives in the Chicago Police Department. *Id.* ¶¶ 5–6. Defendants Sobczak, Donegan, and Pineda have at all times relevant worked as detectives in the Cicero Police Department. *Id.* ¶¶ 7–9. Defendant Killacky served as an investigator for the Cook County State's Attorney Office. *Id.* ¶ 10. Plaintiff sues these Defendants in their individual capacities. *Id.* ¶¶ 5–10.

In addition to the individual Defendants, Plaintiff sues Defendants Kim Foxx in her capacity as the Cook County State's Attorney, the City of Chicago, and the Town of Cicero for indemnification purposes. *Id.* ¶¶ 11–13, Counts VI–VIII.

### B.    Overview of Plaintiff's Criminal Case History

On April 14, 2004, Plaintiff was arrested and charged with two murders, home invasion residential burglary, attempted robbery, and aggravated criminal sexual assault. *Id.* ¶ 14. A jury convicted Plaintiff with the two murders. *Id.* ¶ 16. On April 23, 2012, the court sentenced Plaintiff to life imprisonment. *Id.*

On November 4, 2014, the Illinois appellate court reversed Plaintiff's

conviction and remanded the case for a new trial. *Id.* ¶ 17; *People v. Dukes*, 2014 IL App (1st) 121541-U, 2014 WL 5761163 (Nov. 4, 2014).

On July 11, 2019, the trial judge found Plaintiff not guilty after a bench trial and released him from custody. [4] ¶ 18. Plaintiff spent 5,566 days in custody—or 15 years and 91 days. *Id.* ¶ 19.

### C.    Evidence at First Trial

At his first trial, the prosecutors introduced the following evidence against Plaintiff. *Id.* ¶ 20. Marilyn Williams owned a house in Cicero; in the summer of 1993, she lived upstairs in the house with her daughter, Lucy, and Lucy's two children, Dustin (then 2 years old) and Bridget (then 8 years old). *Id.* ¶ 21. Marilyn rented part of the first floor to Marko Tomazovich. *Id.*

Sometime that summer Marilyn met Plaintiff and leased him a second unit on the first floor. *Id.* ¶ 22. Plaintiff and Lucy briefly engaged in a sexual relationship that summer. *Id.* On July 23, 1993, Lucy told Plaintiff she was going to marry her longtime boyfriend, Kevin Rhynes, the next day. *Id.* ¶ 23. Plaintiff wished her luck. *Id.* Lucy had sex with Plaintiff that night and married Kevin at the courthouse the next day. *Id.* Thereafter, Lucy and her children moved into Kevin's home, and Plaintiff moved out of Marilyn's home. *Id.*

The other tenant in the home, Tomazovich, experienced severe substance abuse and addiction issues. *Id.* ¶ 24. By summer 1993, Tomazovich stopped paying rent. *Id.* ¶ 24. Lucy handed Tomazovich an eviction notice for failure to pay rent and both Marilyn and Lucy told him to move out. *Id.* ¶ 25. He replied, "Fuck you, bitches;

I ain't paying." *Id.* Later, Tomazovich said to Marilyn, "One day, I'm going to get you when you're alone. You better watch your back. I'm going to kill you." *Id.*

On August 28, 1993, Lucy left her kids with Marilyn while she went to work as a cocktail waitress. *Id.* ¶ 26. She went to Marilyn's home the next morning, whereupon she found the door ajar and saw her son, Dustin, sleeping on a couch. *Id.* ¶ 27. Lucy found Marilyn and her daughter, Bridget, dead in the bathtub. *Id.* She picked up the telephone but heard no dial tone, so she went down to Tomazovich's unit and banged on the door. *Id.* When he answered, she told him to call 9-1-1. *Id.* Tomazovich came upstairs with her and then went to a neighbor's home to call the police. *Id.*

The medical examiner found that Bridget died when someone tied a ligature around her neck. *Id.* ¶ 28. Tears on her vagina indicated she had been raped shortly before her death. *Id.* Marilyn also died from suffocation. *Id.* Her head bore marks showing the result of blunt force trauma shortly before death. *Id.*

After police recovered a blood-soaked comforter from Marilyn's home, lab tests showed that the blood matched Bridget's blood. *Id.* ¶ 29. Police also found several hairs on the comforter. *Id.* From Tomazovich's unit, police obtained a bloody shirt and bloody jeans. *Id.* Lab tests indicated that the blood from Tomazovich's clothes matched Tomazovich, but not Bridget or Marilyn. *Id.*

In an initial interview on August 29, 1993, Tomazovich told Defendant Sobczak, a Cicero police detective, that he knew nothing about the murders. *Id.* ¶ 30. He told Sobczak that he bled on his shirt and jeans in a bar fight and during a fight

in the woods. *Id.* In October 1994, police arrested Tomazovich for two robberies. *Id.* ¶ 31. Tomazovich pled guilty and the court sentenced him to six years in prison. *Id.*

In March 1995, Sobczak again interviewed Tomazovich about the murders because he remained a suspect in the case. *Id.* ¶ 32. Again, Tomazovich denied knowledge about the murders. *Id.* He changed his story, however, when Sobczak interviewed him against in August 1995. *Id.* ¶ 32. During that interview, Tomazovich said he watched while Plaintiff murdered Marilyn, then raped and murdered Bridget. *Id.* ¶ 32.

Police arrested Plaintiff in 1995 and found part of Lucy's driver's license in his wallet. *Id.* ¶ 33. Plaintiff told Defendant Sobczak that he knew nothing about the murders and had not been at Marilyn's house the night of the murders. *Id.* Police released Plaintiff without charging him at that time. *Id.*

In 1998, police arrested Tomazovich and questioned him about the murders. *Id.* ¶ 34. This time, Tomazovich said he held Marilyn's legs while Dukes strangled her. *Id.* Prosecutors then charged Tomazovich with the murders. *Id.* Five years later, in October 2003, Tomazovich agreed to plead guilty to home invasion and to testify against Plaintiff in exchange for the dismissal of the murder charges against him. *Id.* ¶ 35.

Plaintiff alleges that in October 2003, Defendant Killacky tried, while acting undercover, to induce Plaintiff to confess to the murders. *Id.* ¶ 36. Killacky did not succeed. *Id.*

Officers arrested Plaintiff on drug charges on January 9, 2004. *Id.* ¶ 36.

According to Plaintiff, police questioned him for approximately 36 hours, almost continuously, including a period when he "was surreptitiously interrogated and recorded by defendant Brian Killacky, who was placed in" his cell. *Id.* ¶¶ 36–37, 63–64. Defendants Washburn, Rodriguez, Donnegan, and Pineda also participated in this interrogation. *Id.* ¶ 65. Throughout the interrogation, Plaintiff did not receive any *Miranda* warnings. *Id.* ¶ 66. Plaintiff asked for and was refused counsel at many points during the interrogation. *Id.* ¶ 67.

On January 10, Defendant Washburn questioned Plaintiff. *Id.* ¶ 38. At trial, Washburn claimed that Plaintiff said he wanted to tell Washburn about his participation in the double murders but first wanted to make some phone calls. *Id.* ¶ 39. According to Washburn, after the calls, Plaintiff said he would make a statement about his participation in the murders if the State promised to not seek the death penalty. *Id.* ¶ 40. Washburn spoke to his supervisor, and upon return, said that the "State's Attorney's office wants to know exactly what you're going to say in your statement regarding the murders." *Id.* According to Washburn, Dukes then said, "well, I'm going to tell them about my participation the murders of Marilyn and Bridget." *Id.* Washburn asked, "What are you going to say? That you killed Marilyn and Bridget?", to which Plaintiff answered, "yes, yes, I am." *Id.*

### D. Motion Suppress and Trial Testimony

Before his trial, Plaintiff filed a motion to suppress the discussions he had with Washburn and Cook County assistant State's Attorney Jim Papa as plea negotiations. *Id.* ¶ 41. The trial court denied the motion except that it decided the

State could not elicit testimony that Plaintiff asked for a sentence of twenty years, then a sentence of forty years, in exchange for a statement about the murders. *Id.*; *Dukes*, 2014 IL App (1st) 21541-U, ¶ 17.

During trial, the State presented an expert on hair comparison, who testified that two hairs found on the blood-soaked comforter appeared to be pubic hairs. [4] ¶ 42. Those hairs matched Plaintiff's hair, and they did not match Tomazovich's, Marilyn's, or Bridget's hair samples. *Id.* The expert also looked at other hairs from the comforter and found that they did not match Plaintiff's, Tomazovich's, Marilyn's, Bridget's, or any other samples prosecutors asked her to compare to the hairs from the comforter. *Id.* ¶ 43. The expert admitted that nothing about the hairs indicated when or how the hair arrived at the comforter. *Id.* The expert also admitted that Plaintiff's hair could have gotten on the comforter when he lived in the house and sometimes visited Lucy. *Id.* ¶ 44.

Defendant Washburn testified about the January 10 interview with Plaintiff. *Id.* ¶ 46. On cross-examination, defense counsel elicited Washburn's testimony that Plaintiff sought sentences of 20 and 40 years in exchange for his statement. *Id.*

Defendant Sobczak also took the stand, testifying that she asked Plaintiff about his relationship with Lucy when she questioned Plaintiff in 1995. *Id.* ¶ 47. According to Sobczak, Plaintiff "kept on and on about how she liked rough sex, and that they wanted each other and he would have sex with her and she wanted him and little detail like about roughness and stuff of sex." *Id.* When defense counsel objected, the prosecutor promised to show the relevance of the testimony to motive, and the

judge overruled the objection. *Id.* ¶ 48. Sobczak also testified that she asked Plaintiff why he had Lucy's picture from her license in his wallet. *Id.* ¶ 49. She claimed that Plaintiff said Marilyn asked him to stop Lucy from marrying Kevin, so after he had sex with Lucy the night before her wedding, he took Lucy's identification cards thinking that she could not complete a civil ceremony without them. *Id.* ¶ 49.

Sobczak also provided testimony undermining the alibi Plaintiff gave her: She said that while Plaintiff told her that he spent the night of the murders at a crack house, in 2004 she found the crack house where Plaintiff said he stayed and verified that he did not spend the night of the murders there. *Id.* ¶¶ 50–51.

Lucy testified that she found she had no identification cards when she arrived at the courthouse for her wedding on July 24, 1993. *Id.* ¶ 52. She did, however, have her birth certificate which the court accepted for the civil ceremony. *Id.* Lucy saw Plaintiff several times after the wedding; one time, he gave her back the identification cards. *Id.* ¶ 53. Another time, Plaintiff went to the place where Lucy waitressed, and Lucy told him the relationship was over. *Id.* Lucy testified that she did not like rough sex and never said to Plaintiff that she liked rough sex. *Id.* Although defense counsel moved to strike references to "rough sex" as irrelevant, the court denied that motion. *Id.*

Tomazovich testified he had a love/hate relationship with Marilyn. *Id.* ¶ 54. The parties stipulated that Tomazovich threatened to kill Marilyn after she and Lucy served him with an eviction notice in 1993. *Id.* Tomazovich testified extensively as to the events of August 28, 1993. *Id.* ¶ 55. He claimed that around 10:00 p.m. that

evening, Plaintiff came by his home with beer; after they drank some, Plaintiff asked Tomazovich for money, to which Tomazovich replied he had none. *Id.* According to Tomazovich, Plaintiff suggested they could ask Marilyn for money, and the two men went upstairs and Tomazovich knocked on Marilyn's door. *Id.* ¶ 56. Marilyn let them in and gave Tomazovich $5.00. *Id.*

Tomazovich testified that when Marilyn saw Plaintiff, she started yelling at Plaintiff and Plaintiff yelled back. *Id.* ¶ 57. Plaintiff then knocked Marilyn down and started strangling her. *Id.* Tomazovich tried to pull him off, but Plaintiff swung a fist and hit Tomazovich in the head. *Id.* When Marilyn tried to get up, Plaintiff got back on top of her and strangled her. *Id.* He told Tomazovich to hold Marilyn's legs, and Tomazovich did so. *Id.* He let go quickly but Marilyn did not move or speak. *Id.* According to Tomazovich, Plaintiff rummaged through the home looking for cash. *Id.*

Tomazovich further testified that he saw Plaintiff carry Bridget into the bedroom. *Id.* ¶ 58. Tomazovich followed and saw that Plaintiff had taken Bridget's pants off. *Id.* Tomazovich said, "what the fuck." *Id.* Plaintiff hit Tomazovich in the chest. Then, according to Tomazovich, he watched Plaintiff rape Bridget. *Id.* Tomazovich tried to grab Bridget, but Plaintiff hit Tomazovich repeatedly and pushed him out of the bedroom. *Id.* Plaintiff then carried Bridget into the bathroom and threatened to do the same to Tomazovich's children if Tomazovich said anything. *Id.* Tomazovich testified that he went downstairs to his home and took off his soiled clothes. *Id.* ¶ 59.

Plaintiff alleges that, to persuade the jury that Tomazovich had not concocted

9

his account of the murders in response to police questioning, the prosecutor asked him about a conversation between Tomazovich and his friend, Arlene Kwil, a few days after the murders. *Id.* ¶ 60. Tomazovich testified that he told Kwil that he could not stop Plaintiff. *Id.*

### E. Appellate Reversal and Re-Trial

On direct appeal, the appellate court reversed and remanded for a new trial, finding that the trial court erred when it: (1) denied Plaintiff's motion to suppress the confession he made to Washburn because these statements were made in the course of plea negotiations; (2) denied the defense's motion to strike all references to "rough sex"; and (3) allowed Tomazovich to testify about his conversation with Kwil. *Id.* ¶ 68.

On remand, Plaintiff waived his right to a jury trial and took a bench trial. *Id.* ¶ 69. With the exception of the evidence the appellate court held the trial court should have excluded, the parties stipulated to the evidence from the first trial. *Id.* ¶ 70. The trial judge acquitted Plaintiff on July 12, 2019. *Id.* ¶ 71.

### F. Federal Claims

On July 12, 2021, Plaintiff filed an eight-count complaint under 42 U.S.C. § 1983 and state law, claiming: fabrication of evidence in violation of his Fourteenth Amendment due process rights against Washburn and Rodriguez (Count I) and Sobczak (Count II); coerced confession in violation of his Fourteenth Amendment due process rights against Washburn, Rodriguez, Donegan, Pineda, and Killacky (Count III); failure to provide *Miranda* warnings against Washburn, Rodriguez, Donegan,

Pineda, and Killacky (Count IV); failure to comply with his invocation of his right to counsel against Washburn, Rodriguez, Donegan, Pineda, and Killacky (Count V); and state-law indemnification claims against the City of Chicago (Count VI), Town of Cicero (Count VII), and Kim Foxx in her capacity as the Cook County State's Attorney (Count VIII). [4].

The Defendants have all moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). [29]; [34]; [40]; [55].

## II. **Legal Standard**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a claim, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), the claim "must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts the well-pleaded factual allegations as true and draws all permissible inferences in the pleading party's favor. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020). Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

### III.    Analysis

Defendants have moved to dismiss the complaint against them on several grounds. They argue that the statute of limitations bars Plaintiff's Section 1983 claims (and as a result, the indemnification claims), and in the alternative, that the claims fail on their merits for other various reasons. This Court will address the statute of limitations defense first before turning to the merits of the parties' arguments.

### A.    The Statute of Limitations

In Illinois, a two-year statute of limitations governs Section 1983 civil rights claims for personal injuries. *Herrera v. Cleveland*, 8 F.4th 493, 495 n.2 (7th Cir. 2021) (citing 735 Ill. Comp. Stat. 5/13-202). The parties' dispute centers around the correct accrual date for Plaintiff's claims.

### 1.    Counts I and II: Fabrication of Evidence Claims

In Counts I and II, Plaintiff asserts violations of his Fourteenth Amendment due process rights based on fabrication of evidence. Plaintiff contends that these claims accrued when the trial judge acquitted him after his second trial in July 2019, making his claims timely. *E.g.*, [58] at 5. Defendants, on the other hand, argue that the claims are time-barred because they accrued when the Illinois appellate court vacated his conviction in November 2014. *E.g.*, [30] at 4–5; [46] at 4–5.

In *McDonough v. Smith*, the Supreme Court held that a Fourteenth Amendment due process claim based on fabricated evidence accrues only "once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has

12

been invalidated within the meaning of [*Heck v. Humphrey*, 512 U.S. 477, 486 (1994)]." 139 S. Ct. 2149, 2158 (2019). *Heck* holds that if a Section 1983 plaintiff establishes that if the civil "action, even if successful, will *not* demonstrate the invalidity of any *outstanding* criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." 512 U.S. at 487. A plaintiff satisfies this requirement by demonstrating that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. In short, *McDonough*, incorporating *Heck*, teaches that a fabrication of evidence claim can accrue either where a criminal prosecution ends without a conviction or where a conviction has been invalidated on appeal. 139 S. Ct. at 2158.

In cases involving a single criminal trial, determining the claim accrual date is relatively straightforward because a criminal prosecution usually terminates in a defendant's favor only one time—for instance, when a defendant is acquitted, when he receives habeas relief, or when after a conviction is reversed the government elects to dismiss charges and not re-try the defendant. *See, e.g.*, *Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426, at *6 (N.D. Ill. Sept. 28, 2021) (holding that the plaintiff's fabricated evidence claim accrued when the State dismissed charges against the plaintiff in 2019, not when the appellate court reversed and invalidated his conviction in 2017); *Walker v. City of Chicago*, No. 20 C 7209, 2021 WL 4080770, at *2 (N.D. Ill. Sept. 8, 2021) (concluding that fabrication of evidence claims did not accrue when the

appellate court vacated the plaintiff's conviction and granted him a new trial in 2018, but rather when the State dismissed his case in 2019); *Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *5 (N.D. Ill. Sept. 26, 2019) ("Plaintiff's fabrication-of-evidence claim regarding the 1990 trial and convictions did not begin to accrue until 2017, when his convictions were vacated and the charges against him were finally dropped.").

But in this case, the government tried Plaintiff twice and both prosecutions resolved in Plaintiff's favor, giving rise to two possible claim accrual dates: (1) 2014, when the appellate court reversed Plaintiff's conviction; and (2), 2019, when the trial judge acquitted Plaintiff following his re-trial. Given these circumstances, the parties unsurprisingly dispute the governing claim accrual date. This Court is persuaded, however, that in the context of this case, Plaintiff's claims did not accrue until his acquittal in July 2019. In *McDonough*, the Supreme Court emphasized that there "is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings *while those criminal proceedings are ongoing*." 139 S. Ct. at 2158 (emphasis added) (internal citations and quotation marks omitted). The Court also invoked "pragmatic concerns" with "avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* at 2149.

Here, the appellate court did not terminate the case when it reversed Plaintiff's conviction in 2014; it instead remanded the case to the trial court "for a new trial." *Dukes*, 2014 IL App (1st) 121541-U, ¶ 2. The criminal proceedings thus remained

14

ongoing following the appellate court judgment and did not fully end until Plaintiff's re-trial resulted in an acquittal in July 2019. If the rule were, as Defendants suggest, that Plaintiff had to file his fabrication claims within two years of the appellate court's reversal, he would have been placed in the untenable position of mounting a civil action challenging criminal proceedings while he faced re-trial for murder charges in those same proceedings. This is the very situation *McDonough* cautioned against. 139 S. Ct. at 2158. Because *McDonough* holds that a fabricated evidence claim does not accrue while criminal proceedings remain ongoing, this Court concludes that Plaintiff's claim did not accrue until his 2019 acquittal. 139 S. Ct. at 2158.

Defendants Washburn, Rodriguez, and Sobczak maintain that the "favorable termination" date is the date of the appellate reversal because the evidence they allegedly fabricated—the confession to Washburn and Rodriguez, the statements about Plaintiff's sexual relationship with Lucy to Sobczak—were ruled inadmissible by the appellate court, and thus, the government could not introduce them at the re-trial to Plaintiff's detriment. [40] at 10; [56] at 4. Defendants raise a valid point. After all, evidence fabrication does not implicate due process rights unless the government uses it to deprive the criminal defendant of his liberty, *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016), and here, at least some of the evidence Defendants allegedly fabricated was not introduced at Plaintiff's re-trial and therefore could not have caused Plaintiff to be deprived of his liberty interest under the due process clause. Yet no court has addressed the precise argument Defendants raise—whether, in the

15

context of multiple trials, favorable termination occurs upon reversal of a conviction based upon the trial court's admission of evidence that forms the basis for Plaintiff's fabrication of evidence claim, even if Plaintiff's criminal case remains ongoing. In the absence of such authority, this Court remains bound by the Supreme Court's general rule in *McDonough* that there "is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings *while those criminal proceedings are ongoing.*" 139 S. Ct. at 2158.

Therefore, Plaintiff's fabrication of evidence claims in Counts I and II are timely.

### 2. Count III: Coerced Confession

In Count III, Plaintiff purports to bring a Fourteenth Amendment claim against Washburn, Rodriguez, Donegan, Pineda, and Killacky for "elicitation of coerced involuntary statement." [4] at Count III.[1] Plaintiff claims that the Defendants' use of unconstitutionally coercive interrogation techniques resulted in a confession that the prosecution used against him at trial in violation of his due process rights and rights to be free from self-incrimination. *Id.*

This claim, too, is timely. In *Savory v. Cannon*, the Seventh Circuit, sitting *en banc* and relying on *McDonough*, held that the plaintiff's claims—which included a theory of coerced confession under the Fifth and Fourteenth Amendments—accrued only after he "received a favorable termination of his conviction." *Savory v. Cannon*, 947 F.3d 409, 412, 418 (7th Cir. 2020) (*Savory I*), *cert. denied*, 141 S. Ct. 251 (2020).

---

[1] Plaintiff's related claims for failure to provide *Miranda* warnings and deprivation of his right to counsel (Counts IV and V) fail on their merits, as discussed below.

Thus, like the fabrication of evidence claims above, Plaintiff also timely filed his coercive confession within two years of his acquittal in 2019. *See, e.g.*, *Brown*, No. 18 2019 WL 4694685, at *5 (holding, based on *McDonough*, that the plaintiff "should not be expected to have brought" a coercive interrogation claim "in 2005 while awaiting retrial," and that the plaintiff's claim did not accrue until 2017 when the State agreed to drop all charges against the plaintiff); *see also, e.g.*, *Savory v. Cannon*, 532 F. Supp. 3d 628, 635 (N.D. Ill. 2021) (*Savory II*) (observing, while discussing a Fifth Amendment coerced confession claim, that "[b]ecause the State elected to re-try him after the state appellate court's April 1980 reversal of the convictions entered at his first trial, Savory remained fully subject to pending criminal charges. Those are precisely the circumstances in which, according to *McDonough*, a § 1983 claim has not yet accrued.").

Defendants rely upon *Johnson v. Winstead*, where the Seventh Circuit considered claim accrual in the context of Fifth Amendment coerced confession claims based on incriminating statements at two trials, both of which resulted in convictions and reversals on appeal. 900 F.3d at 439. The Seventh Circuit held that two accrual dates applied—reversal of the first conviction *and* reversal of the second conviction— thus approving a dual-accrual favorable termination methodology in the context of multiple trials. *Id. Johnson*, however, pre-dated *McDonough*, and the Seventh Circuit in *Savory I* declined to resolve the "seeming inconsistency" between the two cases as to whether a court can allow one or multiple accrual dates in the context of a single criminal case with a retrial where the plaintiff brings a coerced confession claim.

*See Savory I*, 947 F.3d at 416 n.3. Instead, the Seventh Circuit directed district courts to "consider in the first instance, after full briefing from both the plaintiff and the defendants, whether and how *McDonough* affects *Johnson*." *Id.*

Following this direction in *Savory I*, multiple district courts have called into question the viability of *Johnson*'s holding in light of *McDonough*. *See Savory II*, 532 F. Supp. 3d at 635 (holding that the "dual-accrual rule of *Johnson* cannot be reconciled with the Supreme Court's analysis in *McDonough*" in a case where the State elected to retry the plaintiff after the appellate court reversed convictions after his first trial); *Ochoa*, 2021 WL 4439426, at *4 (agreeing with the plaintiff that "*Johnson* cannot be reconciled" with *McDonough*); *Brown*, 2019 WL 4694685, at *5 (noting that *Johnson* "is in tension" with *McDonough* and determining that *McDonough*'s single-accrual rule prevails).

This Court agrees with the above cases which have found *Johnson*'s dual-accrual doctrine inconsistent with *McDonough*, and thus concludes that only one accrual date—the date of Plaintiff's acquittal—applies. If the Seventh Circuit addresses and affirmatively resolves the inconsistency between *Johnson* and *McDonough* during the pendency of this case (dual-accrual or one-accrual), Defendants remain free to re-raise their statute of limitations arguments on summary judgment. For now, however, this Court declines to dismiss the claims on statute of limitations grounds.

### B.    Counts IV & V: *Miranda* Warnings and Right to Counsel

Turning now to the merits of the parties' arguments, in Count IV, Plaintiff

18

asserts Fifth and Fourteenth Amendment violations due to the alleged failures of Washburn, Rodriguez, Donegan, Pineda, and Killacky to give him *Miranda* warnings before interrogating him. [4] ¶¶ 85–86. Those Defendants argue that Count IV must be dismissed because the *Miranda* exclusionary rule is not a constitutional right in and of itself, and thus, cannot form the basis of a Section 1983 claim. [40] at 15–18; [60] at 12–13; [46] at 6.

This Court agrees. As Defendants correctly note, "failure to provide such [*Miranda*] warnings is itself not a violation of the Fifth Amendment right against self-incrimination." *Martin v. Marinez*, 934 F.3d 594, 601 n.2 (7th Cir. 2019); *see also Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (holding that "mere coercion does not violate the text of the Self–Incrimination Clause absent use of the compelled statements in a criminal case against the witness"). Here, Count IV alleges only that Defendants "denied [Plaintiff] his fourteenth amendment due process rights by interrogating him without giving him Miranda warnings." [4] ¶ 85. Because mere failure to provide *Miranda* warnings does not amount to a constitutional claim, this Court dismisses Count IV.

In Count V, Plaintiff asserts Fifth and Fourteenth Amendment violations against Defendants Washburn, Rodriguez, Donegan, Pineda, and Killacky for their failures to comply with Plaintiff's invocation of counsel. [4] at Count V (alleging that Defendants interrogated Plaintiff after he "asserted his right to counsel on numerous occasions and requested a lawyer"). Like a claim based on failure to give *Miranda* warnings, a claim based on deprivation of a plaintiff's right to counsel "is also not the

source of a stand-alone constitutional claim, because the right to counsel is derived from the holding in *Miranda*." *Henderson v. Brower*, No. 18-CV-893-JPS, 2018 WL 6267907, at *4 (E.D. Wis. Nov. 30, 2018) (internal quotation marks and citation omitted); *see also Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *12 (N.D. Ill. July 29, 2020). Thus, like the failure to give *Miranda* warnings claim in Count IV, Defendants' deprivations of his right to counsel do not by themselves amount to a violation of his constitutional rights. This Court also dismisses Count V.

This Court notes, however, that its dismissal of Counts IV and V does not foreclose Plaintiff from relying upon his allegations that Defendants denied him counsel and *Miranda* warnings to support his broader claim in Count III. In Count III, Plaintiff alleges that those same Defendants unconstitutionally coerced a confession from him by, among other things, denying him right to counsel and failing to provide him *Miranda* warnings. [4] at Count III. The Fifth Amendment's self-incrimination clause, applicable to states via the Fourteenth Amendment, protects people from coerced confessions. *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). The government violates the self-incrimination clause by using a coerced confession at pre-trial hearings or at trial in criminal cases. *Id.* Coercion depends on the totality of the circumstances, including whether the suspect received *Miranda* warnings and other advice about constitutional rights, whether physical coercion occurred, the length of detention, and the nature of the interrogations. *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); *Koh v. Graf*, 307 F. Supp. 3d 827, 850 (N.D. Ill. 2018); *Jackson v. City of Peoria*, No. 416CV01054SLDJEH, 2017 WL 1224526, at *4 (C.D.

Ill. Mar. 31, 2017). Thus, although Plaintiff cannot assert standalone claims based on denial of counsel or failure to receive *Miranda* warnings, he can nonetheless seek redress for those alleged deprivations under his coerced confession claim in Count III.

### C.    Count III: Personal Involvement and Group Pleading

The various individual Defendants have also moved to dismiss arguing that the complaint has lumped them together, thus failing to satisfy both Federal Rule of Civil Procedure 8, which requires Plaintiff to give fair notice to each Defendant of his wrongdoing, and Section 1983, which requires Plaintiff to allege that a defendant had personal involvement in the alleged constitutional deprivation, *see Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019).

Washburn, Rodriguez, Killacky, Pineda, and Donegan argue that Plaintiff insufficiently pleads their personal involvement as to Count III[2] because Plaintiff alleges their coercive interrogation as a collective body, without singling out the particular actions each Defendant undertook. [40] at 14, 18–20 (Rodriguez and Washburn); [30] at 3 (Killacky); [56] at 12 (Donegan and Pineda). But at this early stage, "an allegation directed at multiple defendants can be adequate to plead personal involvement." *Hill v. Cook County*, 463 F. Supp. 3d 820, 836 (N.D. Ill. 2020) quoting *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1194 (N.D. Ill. 2013). In any case in which "the plaintiff has been injured as the consequence of the actions of an unknown member of a collective body, identification of the responsible party may be impossible without pretrial discovery." *Rodriguez v. Plymouth Ambulance Serv.*, 577

---

[2] They also moved to dismiss Counts IV and V on the same basis, but as discussed above, this Court already dismissed those counts for other reasons.

F.3d 816, 821 (7th Cir. 2009). This is "particularly true in police misconduct cases." *Horton v. City of Rockford*, No. 18 C 6829, 2019 WL 3573566, at *4 (N.D. Ill. Aug. 6, 2019); *see also, e.g.*, *Wilson v. City of Chicago*, No. 09 C 2477, 2009 WL 3242300, at *2 (N.D. Ill. Oct. 7, 2009) ("Two police officers arrest a person, and after handcuffing him and placing him on the ground, one officer kicks the arrestee in the head. It would be patently unfair and illogical to force such a person to identify which of the two officers committed the act before taking discovery.").

Plaintiff's pleading of Count III also satisfies Rule 8. The complaint asserts that Killacky, Washburn, Rodriguez, Donegan, and Pineda all interrogated him "almost continuously" over the course of 36 hours on January 9 and 10, 2004, and that during the interrogation, Defendants extracted involuntary statements from Plaintiff based on the length, manner, and tone of the interrogation, as well as the use of an undisclosed undercover officer, Plaintiff's physician and mental condition, use of promises and threats, the denial of counsel, and the absence of *Miranda* warnings. [4] ¶¶ 64–67, 82. Rule 8 is "not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer." *Koh*, 2013 WL 5348326, at *4. While, of course, Plaintiff must "eventually tie particular officers to particular injuries to survive a motion for summary judgment," *Horton*, 2019 WL 3573566, at *4, this Court will not require him to do so at the pleadings stage.

Defendant Rodriguez also argues that Plaintiff fails to allege sufficient facts to show his personal involvement in Count I, the fabrication count against Washburn

and Rodriguez. [40] at 14. In this count Plaintiff alleges that Rodriguez aided Washburn in authoring a fabricated police report where Washburn falsely claimed that Plaintiff admitted to killing Marilyn and Bridget. [4] ¶ 73. While this Court agrees that the allegations are thin, the law does not require more specificity at this point in the case, particularly where Plaintiff lacks facts exclusively within Defendants' knowledge as to what extent Rodriguez assisted Washburn with authoring the allegedly fabricated police report. At the pleadings stage, Plaintiff need only generally name the "persons responsible for the problem." *Koh*, 2013 WL 5348326, at *4 (quoting *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). That is what Plaintiff has done here. For these reasons, this Court declines to dismiss either Count I or Count III.

### D. Count II: Fabrication of Evidence Against Sobczak

In Count II, Plaintiff asserts that Defendant Sobczak violated her due process rights by fabricating a police report in which she falsely states that: (1) she disproved Plaintiff's alibi; (2) Plaintiff told her that Lucy liked "rough sex"; and (3) Plaintiff told her he took Lucy's identification cards the night before her wedding. [4] ¶¶ 77–78. The "essence" of a fabricated evidence due process claim is that "the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick* v. *City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). A Plaintiff must allege that defendants used fabricated evidence that they knew to be false to deprive him of his liberty.

Defendant Sobczak moves to dismiss Count II on various grounds, but none are persuasive. First, she argues that the record undermines Plaintiff's allegations that her police reports were false because the Illinois appellate court did not consider Sobczak's testimony to be false or fabricated. [56] at 7. This Court is unpersuaded by this argument. The fact that the appellate court did not weigh in on the accuracy of Sobczak's reports does not mean that Sobczak did not fabricate their contents.

Sobczak also argues that she could not have fabricated that Plaintiff told her Lucy liked "rough sex" because Plaintiff admitted that he had a sexual relationship with Lucy when Sobczak questioned him in 1995. [56] at 7. But the complaint does not allege that Plaintiff told Sobzak that Lucy liked "rough sex," nor that Plaintiff admitted to a sexual relationship with Lucy when Sobczak questioned him. This Court must accept as true the complaint's allegation that Sobczak fabricated Plaintiff's statement about "rough sex." Relatedly, Sobczak argues that "the fact that Lucy subsequently testified at trial that she did not like rough sex and never told Plaintiff that she liked rough sex does not mean that Plaintiff did not have that impression about Lucy and did not make statements to Sobczak about it in August 1995." *Id.* True, the fact that Lucy testified that she does not like "rough sex" does not necessarily mean that Plaintiff did not tell Sobczak that she does. Yet this argument only raises a question of fact about what Plaintiff did or did not tell Sobczak and does not present a basis for dismissal. At this stage, this Court must accept as true Plaintiff's allegations that Sobczak fabricated the fact that Plaintiff told him that Lucy liked "rough sex." *Lax*, 20 F.4th at 1181.

24

Sobczak also unpersuasively argues that she did not fabricate Plaintiff's statements that he took Lucy's identification cards the night before her wedding because Lucy provided testimony consistent with that statement—specifically, that she realized her identification card was missing the day of her wedding and that Plaintiff returned her card after she was married. [56] at 7–8; *see* [4] ¶¶ 52–53. But the fact that Lucy's testimony was consistent with Sobczak's does not necessarily foreclose the possibility that Sobczak nonetheless fabricated Plaintiff's statement that he took Lucy's identification cards. Both things can be true: Sobczak may have fabricated the fact that Plaintiff told him about stealing the identification cards *and* Lucy testified that she lost her identification cards and Plaintiff returned them to her after the wedding. Whether Sobczak did, in fact, fabricate evidence cannot be determined at this stage; this Court must accept as true Plaintiff's assertion that she "created evidence" she "knew to be false." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014).

Sobczak further argues that Plaintiff cannot claim that she fabricated the fact that she disproved Plaintiff's alibi of staying at a crack house on the night of the murders because Plaintiff "did not witness what [she] did or didn't do" to check out the alibi. [56] at 8. This argument, too, fails to persuade. Plaintiff is not alleging that Sobczak is lying about how she went about investigating Plaintiff's supposed alibi; he is claiming that she lied that Plaintiff gave her the address of a "crack house" as an alibi. [4] ¶ 78. The allegations of Sobczak's "concocting narratives based on details" she "knew to be false" sufficiently state a fabrication claim. *Fulton v. Bartik*, 547 F.

Supp. 3d 799, 813 (N.D. Ill. 2021).

The Town of Cicero also argues for dismissal on Sobczak's behalf, suggesting that Sobczak's allegedly fabricated evidence was immaterial to Plaintiff's conviction. [35] at 5. The Town points to the facts that Plaintiff's defense at trial did not challenge Sobczak's investigation of his alibi or question her about its veracity and that Sobczak's testimony was also introduced at Plaintiff's second trial (minus the references to "rough sex") resulting in an acquittal. *Id.* The Town's argument relies upon the principle that "an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence 'is later used to deprive the [criminal] defendant of her liberty in some way," *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (alteration in original) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)), but erroneously assumes that Sobczak's testimony was not germane to the jury's decision to convict Plaintiff. As Plaintiff notes, Sobczak's testimony about a false alibi could clearly have been relevant to the conviction, as it would tend to indicate Plaintiff's consciousness of guilt. So could her testimony about Plaintiff admitting to stealing her identification cards; this evidence might have suggested to the jury that Plaintiff killed Marilyn and Bridget in retaliation for Lucy's decision to get married even though she carried on alleged affair with Plaintiff. Moreover, the fact that the bulk of Sobczak's evidence was re-introduced at Plaintiff's retrial does not undercut its materiality at the first trial.

Finally, this Court rejects the Town's contention that Plaintiff fails to specify which parts of Sobczak's reports he claims she fabricated. *Contra* [35] at 5–6. As

discussed, the complaint specifically lists the particular facts Plaintiff claims Sobczak lied about: the disproven alibi, that Plaintiff admitted to stealing identification cards, and that Plaintiff said that Lucy liked "rough sex." Thus, contrary to the Town's contention, the complaint contains plenty of specificity.

### E.   Counts VI, VII, VIII: Indemnification Claims

Finally, this Court addresses the indemnification claims in Counts VI and VII. Section 1983 plaintiffs may sue counties and cities to indemnify their employees for actions taken in the scope of their employment. *T.S. v. Twentieth Century Fox Television*, 548 F. Supp. 3d 749, 785 (N.D. Ill. 2021); *Cates v. Manning*, No. 19 C 5248, 2020 WL 1863299, at *2 (N.D. Ill. Apr. 14, 2020); 745 Ill. Comp. Stat. 10/9-102.

The Town of Cicero and City of Chicago move to dismiss the indemnification claims against them in Counts VI and VII only to the extent this Court dismisses the claims against their employees—Donegan, Pineda and Sobczak for the Town; Washburn and Rodriguez for the City. [35] at 7; [40] at 20. But because claims against those individual Defendants remain viable, the indemnification claims against the Town and City do, too. *See Walker v. City of Chicago*, No. 1:21-CV-02648, 2022 WL 971891, at *7 (N.D. Ill. Mar. 31, 2022) ("Because the fabricated-evidence claim survives against the individual Defendants, the indemnification claim survives too.").

State's Attorney Kim Foxx seeks dismissal of the official-capacity indemnification claim against her in Count VIII, arguing that the Eleventh Amendment bars such claims. [30] at 9. Perhaps recognizing the Eleventh Amendment problems with his claim, Plaintiff has agreed to dismiss Foxx from Count

VIII. [37] at 2; *see also Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *16 (N.D. Ill. Feb. 2, 2006) ("Because state's attorney's offices are state agencies, the Eleventh Amendment bars Plaintiff's claims against the Cook County State's Attorney's Office."), *aff'd*, 752 F.3d 1079 (7th Cir. 2014). This Court therefore dismisses Foxx by agreement of the parties.

Plaintiff also seeks leave to amend to substitute Cook County as the defendant in Count VIII. [37] at 2. Plaintiff's request is consistent with the case law which holds that Cook County is a "proper party for indemnification purposes" in a suit against individuals in the State's Attorney's office. *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1040 (N.D. Ill. 2018); *see also, e.g.*, *McCullough v. Hanley*, No. 17 C 50116, 2018 WL 3496093, at *18 (N.D. Ill. July 20, 2018) (holding that DeKalb County "has a duty to indemnify State officials, like State's Attorneys, because the County funds the office of that official"); *Armour v. Country Club Hills*, No. 11 C 5029, 2012 WL 4499050, at *8 (N.D. Ill. Sept. 27, 2012) (ruling that Cook County is a necessary party in suit against an assistant State's Attorney because it "may be required to pay a judgment entered against an independently-elected officer who is paid by the county"). Since Killacky, an investigator for the Cook County State's Attorney, remains as a Defendant in this case, Cook County might be on the hook to indemnify him if ultimately found liable. Accordingly, this Court gives Plaintiff leave to amend his complaint to name Cook County as a Defendant for indemnification purposes.

## IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part

Defendants' motions to dismiss [29]; [34]; [40]; [55]. As a result of this Court's rulings, Counts I, II, III, VI, and VII stand, while Counts IV and V are dismissed. This Court also dismisses Defendant Kim Foxx from Count VIII, but gives Plaintiff leave to amend his complaint to substitute Cook County as a Defendant for indemnification purposes. Plaintiff shall file his amended complaint by May 6, 2022. Defendants shall answer by May 27, 2022.

E N T E R:

Dated: April 26, 2022

MARY M. ROWLAND
United States District Judge

29