## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WILLIAM DUKES,

                Plaintiff,

      v.

JAMES WASHBURN, ROLANDO
RODRIGUEZ, and CITY OF CHICAGO,

                Defendants.

Case No. 21-cv-03672

Judge John Robert Blakey

### MEMORANDUM OPINION AND ORDER

Plaintiff William Dukes sued under 42 U.S.C. § 1983, alleging the Defendants, Detective James Washburn and Detective Rolando Rodriguez, violated his constitutional rights when they fabricated evidence of a false custodial confession and coerced involuntary statements. Plaintiff also sues the City of Chicago for indemnification under state law. Defendants have moved for summary judgment on various grounds. [165]. For the reasons explained below, this Court grants their motion for summary judgment.

## I.    Background

The following facts come from Defendants' Local Rule 56.1 statement of undisputed material facts [164], Plaintiff's response to Defendants' 56.1 statement [177], Plaintiff's Local Rule 56.1(b)(3) statement of additional facts [175], [198], and Defendants' response to Plaintiff's statement of additional facts [190]. To the extent Defendants challenge Plaintiff's response and additional facts, the Court has

discretion to apply the 56.1 rules "strictly or to overlook any transgression." *Waldrige v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 2004). Plaintiff refiled the statement of additional facts, including the referenced exhibits, which now conforms with Local Rule 56.1(b)(3)(C). [198]. Any facts from Defendants' Local Rule statement that Plaintiff failed to properly respond to per Local Rule 56.1(b)(3)(B) is deemed admitted, but it does not materially change the outcome of Defendants' motion.

This case arises from the 1993 murders of Marilyn Williams and Bridget Cannady. In 1993, Marilyn owned a two-flat in Cicero, Illinois where she lived on the second floor with her daughter Lucy Rhynes and Lucy's two children, 2-year-old Dustin Rhynes and 8-year-old Bridget Cannady. [177] ¶ 8. Marilyn rented the first floor of the flat to Marko Tomazovich. *Id.* ¶ 9. Marko lived there with Diane Benitez. *Id.* Marilyn and Lucy hired William Dukes to do repairs on their cars in April 1993, and soon after Dukes rented a room on the second floor of Marilyn's house for fifty dollars a week. *Id.* Dukes and Lucy began a sexual relationship in May 1993. *Id.* ¶ 11. In July 1993, Lucy told Dukes that she intended to marry her boyfriend, Kevin Rhynes. *Id.* Dukes and Lucy slept together the night before the wedding. *Id.* ¶ 12. After the wedding, Lucy and her children moved in with Kevin, and Dukes moved out of Marilyn's house the following day. *Id.* ¶¶ 12–13. Between the wedding and August 28, 1993, Dukes saw Lucy a couple times at her home and her work. *Id.* ¶ 15.

On August 28, 1993, Lucy worked the night shift as a cocktail waitress and dropped Bridget and Dustin off with her mother. *Id.* ¶ 16. When Lucy went to

Marilyn's house the next morning to pick up Dustin and Bridget, she found her son asleep on the couch and the bodies of Marilyn and Bridget in the bathroom. *Id.* ¶¶ 17–19. Lucy picked up Bridget and laid her on the bathroom floor. *Id.* ¶ 19. Lucy went down to Marko's apartment, told him to call 911, and returned upstairs. *Id.* Paramedics and detectives from the Cicero Police Department arrived, and Lucy was made to leave the apartment. *Id.* ¶ 20. Thomas Cebulski, a Cook County Sheriff's Evidence Technician, processed the crime scene. *Id.* ¶ 21. He observed two victims: Bridget, a partially clothed 8-year-old girl on the bathroom floor and Marilyn, a partially clothed adult woman in the bathtub. *Id.* ¶ 22.

The medical examiner, Dr. Mitra Kalelkar, performed autopsies and found that the manner of death for both Bridget and Marilyn was homicide. *Id.* ¶¶ 23, 24, 26. The cause of death for Marilyn was asphyxiation. *Id.* ¶ 24. Marilyn's body showed signs of multiple blunt force injuries, including broken bones in her neck, and a hemorrhage on the top of her head. *Id.* Bridget showed signs of strangulation and sexual assault prior to her death. *Id.* ¶ 25. Bridget's injuries included: "hemorrhages around both eyes, a right shoulder bruise, hemorrhages on her chest, a small abrasion on her back, hemorrhages on her neck, a large tear in her vagina, smaller tears in her vagina, and her anus had been stretched." *Id.* Dr. Kalelkar concluded that Bridget died by strangulation. *Id.* ¶ 26. The Cicero Police Department continued to investigate the murders for approximately the next 10 years. *Id.* ¶ 27.

On August 22, 1998, Marko gave a statement to police explaining that he and

3

Dukes committed the murders and rape of Bridget. *Id.* ¶ 28. Marko stated that he held Marilyn's legs while Dukes strangled her, and he otherwise watched during the murders. *Id.* Marko was charged in 1998 for the murders of Bridget and Marilyn. *Id.* ¶ 29.

In the fall of 2003, the Chicago Police Department's Homicide Cold Case Unit joined the murder investigation. *Id.* ¶ 31. Detectives Washburn and Rodriguez were assigned to the case. *Id.* ¶ 32. As part of the investigation of the murders, the Cook County State's Attorney Office Investigator Brian Killacky went undercover. *Id.* Killacky would develop a relationship with Dukes, record Dukes engaging in illicit activities, arrest Dukes, and question Dukes about the murders. *Id.* Killacky had an undercover relationship with Dukes from November 14, 2003, until January 9, 2004, and bought cocaine from Dukes on multiple occasions. *Id.* ¶¶ 35, 37. Dukes was arrested on three counts of delivery of controlled substances and unlawful use of a weapon by a felon on January 9, 2004. *Id.* ¶ 38. Killacky was undercover with Dukes at the time, and he was "arrested" as well to maintain his cover. *Id.*

Police transported Dukes to the Chicago Police Department's cold case unit offices at Homan and Filmore. *Id.* ¶ 39. Detective Washburn gave Dukes his *Miranda* rights. *Id.*; *Miranda v. Arizona*, 384 U.S. 436 (1966). Police first interviewed Dukes about the gun and drug charges, and then he was interviewed about the murders. *Id.*

The parties disagree on exactly what Dukes said in these interviews. Det. Washburn testified at Dukes' 2011 trial about what Dukes said to him, Det.

4

Rodriguez, and the Assistant State's Attorney in the questioning spanning January 9–10, 2004. *Id.* at ¶ 46–47. At trial, Det. Washburn testified that after Dukes heard his *Miranda* rights, Dukes said he "knew them by heart." *Id.* at ¶ 46. Det. Washburn confronted Dukes about the murders and asked him "what type of sentence did he think he could receive for a brutal double murder," to which Dukes responded, "the needle or death penalty." *Id.* Det. Washburn testified that Dukes then said "I want to get this off my chest. I'll tell you what you want to know." *Id.* Dukes said he wanted to tell Det. Washburn "about his participation in the murder of Marilyn and Bridget," but he wanted to make some calls first. *Id.* Det. Washburn also testified that, after Dukes was allowed to make phone calls, he agreed to give a statement under the condition that "the death penalty be taken off the table." *Id.*

Det. Washburn consulted with the State's Attorney's Office. *Id.* Det. Washburn testified that he told Dukes the State's Attorney's Office wanted to know exactly what Dukes was going to say in his statement, and Dukes responded that he is "going to tell them about [his] participation in the murders of Marilyn and Bridget." *Id.* (alteration in original). Det. Washburn asked Dukes if he was going to state that he killed Marilyn and Bridget. *Id.* Dukes said "'yes, yes, I am,' but that Marko's version was not what happened." *Id.* Det. Washburn testified that he then terminated the interview and told the State's Attorney's Office what Dukes had said. *Id.* ¶ 47. During cross-examination, Det. Washburn additionally testified that Dukes had asked for a sentence of 20 years and then 40 years in exchange for his statement.

5

*Id.* ¶ 48.  After the interviews, on May 20, 2004, Det. Washburn submitted a report which documented his involvement in the murder investigation, including summaries of Dukes' interviews ("May 20 Report").  *Id.* ¶ 40.  This report was not admitted into evidence nor referenced by the State, Dukes, or any witnesses at trial.  *Id.* ¶ 53.

Dukes denies ever admitting to the murders in the January 2004 questioning. *Id.* ¶ 58.  In his deposition for this current case, Dukes acknowledged that Det. Washburn read Dukes his *Miranda* rights and Dukes may have said he "knew them by heart." *Id.* ¶ 39.  Dukes also agreed that when Det. Washburn asked what penalty Dukes thought he could get for a double murder, Dukes responded "the needle." *Id.* ¶ 57.

Dukes argues, however, that the conversation was mischaracterized by Det. Washburn in his court testimony.  *Id.*  Dukes additionally stated that he always said throughout the interviews that he was not involved in the murders and never said anything about Marko's version of the murders.  *Id.* ¶¶ 58, 61.  According to Dukes, "Det. Washburn made everything up" and the May 20 report about the interview "contained 'outright lies.'" *Id.* ¶¶ 58–59.  Dukes testified that Det. Washburn made up that Dukes was going to make a statement in exchange for taking the death penalty off the table, and, in fact, Det. Washburn and Papa offered this proposal.  *Id.* ¶¶ 59, 61.  Per Duke, Det. Washburn also fabricated that Dukes said "yes, yes, I am" when asked if he was going to say that he killed Marilyn and Bridget. *Id.* ¶ 59.  Dukes stated that when Det. Washburn suggested he could make the drug and gun charges

go away, Dukes responded, "you think I'm fucking stupid?  I'm going to plead guilty to a fucking death penalty murder if you get rid of a simple stupid ass drug case, a murder I had nothing to do with?"  *Id.* ¶ 60.  Dukes stated that he asked for a lawyer and to be left alone.  *Id.* ¶ 61.  Dukes also testified he said to Det. Washburn he "didn't do shit" and "ain't pleading guilty to a damn thing."  *Id.*

Dukes was arrested on first degree murder charges in April 2004.  *Id.* ¶ 41. The criminal trial began on December 6, 2011, in Cook County Circuit Court and ended on December 9, 2011.  *Id.* ¶ 42.  The state's witnesses included Jamie O'Campo (Marilyn's son, Lucy's brother), Thomas Cebulski, Dr. Mitra Kalelkar, Marko Tomazovich, Laurie Lee, Gleen Schubert, Jennifer McRitchie, Robert Berk, Doug Ridolfi, Darlene Sobczak, Lucy Rhynes, and Detective Washburn.  *Id.* ¶¶43–44. Detective Rodriguez did not testify at trial.  *Id.* ¶ 44.

Det. Washburn testified at trial regarding Dukes' statements during the interviews on January 9 and 10, 2004.  *Id.* ¶ 46.  Dukes unsuccessfully filed a motion to suppress Det. Washburn's testimony, arguing that Dukes' statements were made during plea negotiations and thus inadmissible.  *Id.* ¶ 49.

Marko testified against Dukes at trial.  *Id.* ¶ 50.  According to the April 14, 2004, plea agreement, Marko agreed to plead guilty to the Class X home invasion felony charge and the State dismissed the murder charges against him; and the State would also recommend a sentence of 25 years, all in exchange for Marko to testify truthfully if called as a witness.  *Id.*  Marko testified that "on August 28, 1993, he

7

watched Dukes murder Marilyn and rape and murder Bridget, and then helped Dukes put their bodies in the bathroom of Marilyn's apartment." *Id.* ¶ 51.

At trial, Dukes called in his defense Dr. Carl Wahlstrom, M.D., Barry Hagan, and Joseph Fiorentino. *Id.* ¶ 52. Dukes did not testify. *Id.* In closing argument, Dukes' defense counsel argued "Particular words about what William Dukes said mattered because there is a difference between 'I will tell you what you want to know if you don't kill me,' and 'I will tell you what I did because I am guilty.'" [190], [198] ¶ 8. Counsel argued that Dukes' statements to Det. Washburn, that is, "I want to give you a statement about my participation in the murders. I am remorseful. I am very despondent," was not the way Dukes talks. [190], [198] ¶ 8. Counsel offered, "Those might be the detective's summary . . ., but those were not the words that William Dukes said. . . . He is not going around telling the detective . . . I am very despondent, that I would like to give you a statement about my participation. Those are not his words. . . . Those are the detective's words." [190], [198] ¶ 8.

The jury found Dukes guilty of the first-degree murders of Bridget and Marilyn, and he was sentenced to life in prison. [177] ¶¶ 54, 55. Dukes immediately appealed his conviction. *Id.* ¶ 55.

On appeal, Dukes argued, among other issues, that the court erred in allowing Det. Washburn's testimony since Dukes' statements during questioning had been part of plea negotiations, a violation of Illinois Supreme Court Rule 402(f). *Id.* ¶ 63. Dukes did not argue on appeal that the statements were fabricated. *Id.*

8

On November 4, 2014, the Appellate Court agreed with Dukes, reversed his conviction, and remanded the case for trial. *Id.* ¶ 64. The court based its decision on the combination of three specific errors: (1) Det. Washburn's testimony improperly included statements by Dukes made in plea negotiations; (2) Det. Sobcazk's testimony about Dukes' statements that Lucy liked "rough sex" were irrelevant and unfairly prejudicial; and (3) Marko's statements implicating Dukes a few days after the murders were inadmissible. *Id.*

On January 28, 2015, the Illinois Supreme Court denied the State's petition for a writ of certiorari, but it directed the Appellate Court to reconsider its ruling in the light of a recent decision, *People v. Rivera. Id.* ¶ 65. The Appellate Court vacated the November 4, 2014 order, and entered a new order on June 16, 2015 ("2015 order"). *Id.* ¶ 66. While the 2015 order considered *People v. Rivera*, the court found the case did not affect its decision and again reversed Dukes' conviction and remanded the case for a new trial. *People v. Dukes*, No. 1-12-1541, 2015 WL 3793075 (Ill. App. Ct. June 16, 2015).

The State pursued a new trial against Dukes. *Id.* ¶ 67. Dukes chose a bench trial instead of a jury trial. *Id.* The Honorable Pamela M. Lemming presided. *Id.* ¶ 69. The parties filed an "Agreed Motion In Limine" which prevented the new trial from considering testimony that had been found inadmissible by the Appellate Court. *Id.* ¶ 68. The motion prohibited the use of Dukes' statements in the January 2004 interviews, except for Dukes' statement "he 'wanted to get this off [his] chest' and he

9

would tell Det. Washburn about his participation in the murders." *Id.* ¶ 82. For the retrial, the parties agreed that the State would proceed on the testimony and exhibits from the first trial, except for exclusions set forth in the Agreed Motion In Limine. *Id.* ¶ 69. There was no live testimony, and Dukes did not testify. *Id.* The May 20 Report by Det. Washburn was not part of the 2019 bench trial record. *Id.* ¶ 74. Judge Leeming, after reviewing the trial transcripts (in accordance with the Agreed Motion In Limine), found that Marko's 2011 trial testimony was not credible and that Dukes' admitted statements in the January 2004 interview were "ambiguous and not an admission." *Id.* ¶ 72. Dukes was found "not guilty" on all counts against him on July 11, 2019. *Id.* ¶ 73.

Dukes filed this lawsuit on July 12, 2021, against the members of the Chicago police force, the City of Chicago, members of the Cicero police force, Brian Killacky, the Town of Cicero, and Kim Foxx in her capacity as the Cook County State's Attorney. [4]. Defendants filed motions to dismiss, which were granted in part and denied in part. [61]. Plaintiff then filed their first amended complaint, removing Kim Foxx. [63]. Following discovery, all Defendants filed Motions for Summary Judgment. [165], [167], [171]. In May 2024, Plaintiff settled with the Cicero defendants, Brian Killacky, and Cook County, leaving the Chicago defendants as the only remaining parties. [194], [195].

In this case, Plaintiff alleges that Dets. Washburn and Rodriguez violated his fourteenth amendment due process rights with the fabrication of a false custodial

10

confession (Count I) and violated his fourteenth amendment due process rights by the elicitation of coerced involuntary statements (Count III). [63] ¶¶ 72–75, 81–83. Plaintiffs also asserts indemnification against the City of Chicago (Count VI). *Id.* ¶ 90–92. The city defendants move for summary judgment on various grounds. [165].

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*,

11

943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Discussion

Defendants argue that both of Plaintiff's claims are barred by the statute of limitations for a Section 1983 claim. Alternatively, Defendants argue that Plaintiff's fabrication of evidence fails as a matter of law and the coercion claim fails because Dukes denies making the allegedly coerced statements. This Court will address each argument in turn.

## A. Statute of Limitations

Defendants repeat the argument from their motion to dismiss that Dukes' Section 1983 claims remain time-barred. While state law governs the length of the statute of limitations, the question of when a Section 1983 claim begins to run "is a question of federal law." *McDonough v. Smith*, 588 U.S. 109, 115 (2019) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). In Illinois, a two-year statute of limitations governs Section 1983 civil rights claims for personal injuries. *Herrera v. Cleveland*, 8 F.4th 493, 495 n.2 (7th Cir. 2021) (citing 735 Ill. Comp. Stat. 5/13-202). The parties here dispute when the statute of limitations began to accrue.

Generally, the statute of limitations begins to accrue "when the plaintiff has 'a complete and present cause of action.'" *McDonough*, 588 U.S. at 115 (quoting *Wallace*, 549 U.S. at 388). Sometimes, "a particular claim may not realistically be brought

12

while a violation is ongoing," in which case the claim may accrue later. *Id.* (citing *Wallace*, 549 U.S. at 389). For this accrual analysis, a court must identify "'the specific constitutional right' alleged to have been infringed." *Id.* Then, courts often look to the common-law principles that govern the tort most analogous to the infringed right. *Id.* These principles do not create strict rules but are meant to guide "more as a source of inspired examples than of prefabricated components." *Id.* at 116 (quoting *Manuel v. Joliet*, 580 U.S. 357, 370 (2017)).

Here, Dukes grounds his fabricated evidence claim in the due process clause of the fourteenth amendment, the same constitutional provision analyzed in *McDonough*. *McDonough* analogized the plaintiff's Section 1983 fabricated evidence claim to the common-law tort of malicious prosecution. *McDonough*, 588 U.S. at 116. Common-law malicious prosecution claims, in turn, only accrue "once the underlying criminal proceedings have resolved in the plaintiff's favor." *Id.* This "favorable-termination requirement" stems from the pragmatic concern of "avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* at 117–18 (citing *Heck v. Humphrey*, 512 U.S. 447, 484–485 (1994)). The Seventh Circuit has also concluded that coerced statement claims under the fourteenth amendment due process right are properly analogized to malicious prosecution as well. *Savory v. Cannon*, 947 F.3d 409, 417 (7th Cir. 2020).

Applying the common-law malicious prosecution rule to a due process claim,

13

*McDonough* held that the statute of limitations accrues only "once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck*." 588 U.S. at 119–20. Before a Section 1983 civil action can proceed, *Heck* requires that the plaintiff show that their civil action "will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff." *Heck*, 512 U.S. at 487. A plaintiff can meet this requirement if his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87. Putting it together, accrual for due process claims, like here, begin where the defendant is acquitted or a direct appeal reverses the conviction.

Since Plaintiff was tried by the State twice and both trials were resolved in Plaintiff's favor, the record presents two possible claim accrual dates: (1) June 16, 2015, when the appellate court reversed Plaintiff's conviction; and (2), July 11, 2019, when the trial judge acquitted Plaintiff following re-trial. If the accrual date is 2015, then Plaintiff's claim is time-barred since he did not file until July 2021, well outside the two-year statute of limitations period. A 2019 accrual date does not pose the same statute of limitations problem. In other words, the proper accrual date in this case depends upon whether Plaintiff's conviction was invalidated within the meaning of *Heck* when the appellate court reversed the first trial court's decision, or if *McDonough* would instead recognize Dukes' 2019 acquittal as the accrual date.

Defendants rely on *Johnson v. Winstead*, decided by the Seventh Circuit before the Supreme Court's *McDonough* decision, to argue the appellate court's reversal is the proper date. In *Johnson*, a Section 1983 plaintiff alleged that police officers' trial testimony regarding plaintiff's statements, given without *Miranda* warnings, violated his fifth amendment rights. 900 F.3d 428, 431 (7th Cir. 2018). The plaintiff's first criminal trial resulted in a conviction, vacated by the appellate court in 2010, and his retrial ended in a conviction, again vacated by the appellate court in 2014. *Id.* at 433. The Seventh Circuit held that the *Heck* bar ended, and the statute of limitations began to accrue for the claims, when each conviction was reversed by the appellate court. *Id.* at 440. The claims from the first trial, then, began to accrue in 2010, and the claims from the second trial began to accrue in 2014. *Id.*

The Seventh Circuit has recognized the tension between *Johnson* and *McDonough*, but it has not yet resolved the apparent inconsistency. *See Savory*, 947 F.3d at 416 n.3. Instead, the court directed district courts to "consider in the first instance, after full briefing from both the plaintiff and the defendants, whether and how *McDonough* affects *Johnson*." *Id.* In response, district courts have relied upon *McDonough* to find that *Johnson* is no longer good law. *See Savory*, 532 F. Supp. 3d at 634 (responding to the Seventh Circuit's instruction by finding "*McDonough v. Smith* overruled *Johnson*"); *Wilson v. Estate of Burge*, 667 F. Supp. 3d 785, 825 (N.D. Ill. 2023) (court found "under *McDonough*, a Section 1983 plaintiff can bring claims only when the criminal proceedings have terminated for good, even if the evidence

15

underlying the claims is suppressed at a retrial."); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1151–52 (N.D. Ill. 2022); *see also Dukes v. Washburn*, 600 F. Supp. 3d 855, 896 (N.D. Ill. 2022) (collecting cases).

Defendants argue the 2015 accrual date is proper here because the allegedly fabricated and coerced statements were not used in Plaintiff's 2019 retrial. Therefore, the argument goes, Dukes did not suffer any harm from the statements in the second trial. Defendants raised this same argument in their Motion to Dismiss, which was denied by this Court based on *McDonough* and its uncertain effect on *Johnson*'s viability. *Dukes*, 660 F. Supp. 3d. at 893–86. ("[N]o court has addressed the precise argument Defendants raise—whether, in the context of multiple trials, favorable termination occurs upon reversal of a conviction based upon the trial court's admission of evidence that forms the basis for Plaintiff's fabrication of evidence claim, even if Plaintiff's criminal case remains ongoing.")

While the parties remain, of course, free to resubmit arguments from a motion to dismiss in a motion for summary judgment, this Court finds no basis to reconsider its prior legal determination until, and only if, "the Seventh Circuit addresses and affirmatively resolves the inconsistency between *Johnson* and *McDonough*." *Id.* at 896. Defendants have not pointed to any new precedent on this issue and simply ask for a different decision with a fully developed record. [165] at 13. Without any clarifying Seventh Circuit precent, however, this Court remains persuaded by the analysis that district courts have continued to follow since the motion the dismiss,

16

that the end of a criminal prosecution marks the proper accrual date. *E.g.*, *Wilson*, 667 F. Supp. 3d 785; *Brown*, 633 F. Supp. 3d 1122; *Olson v. Cross*, No. 18-CV-2523, 2024 WL 361200, at \*19 (N.D. Ill. Jan. 30, 2024).[1]  Among other factors, the concern remains that, if 2015 is the proper accrual date, Dukes would be "placed in the untenable position of mounting a civil action challenging criminal proceedings while he faced re-trial for murder charges in those same proceedings." *Dukes*, 600 F. Supp. 3d at 895.  As previously noted, this is the exact concern guiding *McDonough*'s decision.  *McDonough*, 588 U.S. at 119–120.

Therefore, the Court finds that the 2019 acquittal marks the accrual date for Plaintiff's claim, and thus Plaintiff's fabrication of evidence and coercion of involuntary statements claims are not time-barred.

## B.    Fabrication of Evidence

Even if Plaintiff's Section 1983 claims are timely, Defendants argue Plaintiff's fabrication of evidence claim fails as a matter of law.  A due process fabrication of evidence claim requires a plaintiff to prove: (1) the defendant knowingly fabricated

---

[1]Further support for this holding comes from the accrual dates recognized in post-*McDonough* cases. Even when cases involve single-accrual dates, the accrual dates for these cases did not begin when the appellate court reversed or vacated the convictions, but when the State dismissed the case or dropped the charges.  *See, e.g.*, *Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426, at \*6 (N.D. Ill. Sept. 28, 2021) (holding plaintiff's fabricated evidence claim accrued when the State dismissed charges against the plaintiff in 2019, not when appellate court reversed and invalidated his conviction in 2017); *Walker v. City of Chicago*, No. 20-C-7209, 2021 WL 4080770, at \*2 (N.D. Ill. Sept. 8, 2021) (concluding that fabrication of evidence claims did not accrue when appellate court vacated the plaintiff's conviction and granted him a new trial in 2018, but rather when the State dismissed his case in 2019).  In Dukes' case, then, since the State did prosecute him a second time, his acquittal in the second trial is more analogous to the dismissal of charges in matters involving only one trial.

17

evidence introduced against plaintiff at his criminal trial; (2) the evidence was material; and (3) the plaintiff was damaged as a result. Federal Civil Jury Instructions of the Seventh Circuit § 7.14 (2017 rev.). If an officer simply "fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Whitlock*, 682 F.3d at 582 (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)). The Seventh Circuit has acknowledged the "principle universally recognized by circuits" that the "manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." *Id.* (quoting *Zahrey v. Coffey,* 221 F.3d 342, 348 (2d Cir. 2000)).

In this case, Dukes alleges that Dets. Washburn and Rodriguez authored a fabricated May 20 police report, and that Det. Washburn testified to the allegedly false statements at Duke's trial, even though the report was never admitted, nor ever referenced by anyone, at trial. [177] at ¶ 53 (parties agree that the May 20 report was never referenced or introduced against Dukes at either criminal trial). In response to Defendants' assertion that introduction of the report is required for a successful fabrication of evidence claim, Plaintiff argues it is enough that the contents of the report were used at trial. Not so.

*Brown v. City of Chicago* similarly involved allegedly fabricated police reports that were not referenced at the criminal trial. 633 F. Supp. 3d at 1159. While the

police officer "testified to a version of events consistent with the reports," that alone did not support a fabrication of evidence claim. *Id.* The court held that allegedly false testimony at trial "does not give rise to a viable constitutional claim because witnesses are entitled to absolute immunity" even when the purportedly false testimony "is consistent with fabricated but unadmitted police reports." *Id.* (citation omitted) (first citing *Brisco v. LaHue*, 460 U.S. 325, 327 (1983); and then citing *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017)). In short, if a police officer testifies to statements from an allegedly false police report at trial, but the report itself is never referenced, the police officer is protected by witness absolute immunity. While Plaintiffs cite to *Avery* in their response, there the fabricated police reports *were* introduced into the trial record. *Avery*, 847 F.3d at 441. A police officer who fabricates evidence is liable for a due process violation only if the evidence is "used to deprive the defendant of her liberty in some way." *Id.* at 439 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). *Avery* noted that "an officer who fabricates evidence" cannot "immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony." *Id.* at 441. *Avery* made clear that where fabricated evidence is introduced at trial, as it was in that case, an officer who fabricated the evidence cannot avoid liability by using the shield of witness immunity. *Id.* No due process violation results, however, if the allegedly fabricated evidence is never used against

19

the defendant at trial. *Whitlock*, 682 F.3d at 582.[2]

In this case, the allegedly false May 20 report was never authenticated, referenced, mentioned, or otherwise introduced into evidence at trial. Even if Det. Washburn fabricated Dukes' statements in the report and testified at trial, the claim is fatally flawed. *Whitlock*, 682 F.3d at 582 (No cause of action for an officer putting "fabricated evidence in a drawer, making no further use of it" even if he knowingly gives testimony as a witness consistent with that allegedly fabricated evidence) (citing *Buckley*, 20 F.3d at 795). As *Briscoe* makes clear, in such a situation, the testifying officer would be protected by absolute immunity. 460 U.S. at 345; *see also Jones v. New York*, 34 F.4th 550, 563 (7th Cir. 2022) (noting that plaintiff could not use *Avery* to circumvent *Briscoe* where officer testified about an allegedly fabricated police report). This absolute immunity "covers the preparation of testimony as well as its actual delivery in court." *Canen v. Chapman*, 847 F.3d 407, 415 (7th Cir. 2017).

---

[2] Plaintiff misplaces reliance on several other cases to argue that the inclusion of the contents of fabricated evidence alone at trial are sufficient, but in each case the fabricated evidence was introduced into evidence through some express reference to the false exhibit. *See Taylor v. City of Chicago*, No. 14-C-737, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the prosecution did not seek to admit the report in evidence, the prosecution noted the existence of the report before the jury and discussed the contents of the report during Glinski's examination."); *Walker v. White*, No. 16-CV-7024, 2021 WL 1058096, at *8 (N.D. Ill. Mar. 19, 2021) (finding allegedly fabricated photos admitted into evidence through authentication of oral testimony were used against plaintiff at trial). Another case cited by Plaintiff, *Velez v. City of Chicago*, No. 18-CV-08144, 2023 WL 6388231 at *12 (N.D. Ill. Sep. 30, 2023), relies on *Taylor* but does not explain whether the allegedly fabricated police reports were mentioned at trial, even though they were not admitted into evidence. *Zambrano v. City of Joliet*, No.:1:21−cv−04496, Dkt # 38 (Seeger, J.), also cited by the Plaintiff, later held that the allegedly fabricated evidence was not used at trial "because the police report did not come into evidence." *Zambrano v. City of Joliet*, No. 21−cv−04496, 2024 WL 532175, *9 (N.D. Ill. Feb. 9, 2024) (citing *Patrick*, 974 F.3d at 835). In any event, since the cited cases are unpublished district court opinions, this Court is not persuaded or otherwise bound by the decisions.

Despite the injustice for a particular defendant in this hypothetical situation, the Supreme Court has already struck the balance of "evils inevitable in either alternative" by deciding that absolute immunity for testifying officers serves "the broader public interest." *Briscoe*, 460 U.S. at 345 (quoting *Gregoire v. Biddle*, 117 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, J.)).

Therefore, Dukes has failed to prove that the allegedly fabricated evidence (the May 20 report) was used against him at his criminal trial, and to the extent Det. Washburn's testimony mirrored the contents of the May 20 report, he enjoys absolute witness immunity. As a result, Dukes' fabrication of evidence claim fails as a matter of law.

Defendants' motion for summary judgment as to Count I is granted.

## C.    Coercion of Involuntary Statement

Defendants next argue that since Dukes has denied making any statements that were allegedly coerced, Dukes' coercion of involuntary statement claim fails as a matter of law. [165] at 28. Plaintiff responds that *Lee v. Mississippi*, 332 U.S. 742 (1948) permits him to concurrently argue that police fabricated his statements and that police coerced the same statements. [176] at 14. This response, however, ignores Plaintiff's burden at the summary judgment stage, known as the "'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (quoting *Schacht v. Wisconsin Department of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999)). Plaintiff does not develop any argument or facts to support his coercion claim beyond

21

the *Lee* citation. *See* [176] at 14; [198]. Likewise, the record fails to support Plaintiff's coercion claim.

A successful claim for a coerced confession must show that the plaintiff "has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003). Plaintiff does not articulate which allegedly coerced statements were used against him at his trials; in fact, he denies making any coerced statement at all. [177] ¶ 58. Necessarily, Plaintiff thus fails to "put up" at this summary judgment statement any evidence to support that any coerced statements were used against him at trial. Accordingly, Plaintiff cannot prove his coercion claim, *see Chavez*, 538 U.S. at 770, and the Court grants Defendants' motion for summary judgment on this claim.

## D.     City of Chicago

Plaintiff alleges one claim against the City of Chicago, an indemnification claim. Under Section 2-109 of the Illinois Tort Immunity Act, "a local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 Ill. Comp. Stat. 10/2-109 (2023). Since the Court grants Defendants' motion for summary judgment for the remaining counts, the Court correspondingly grants Defendant's motion for summary judgment.

**IV.    Conclusion**

For the reasons explained above, this Court grants the Defendants' motion for summary judgment [165].   The Clerk shall enter judgment for Defendants and against Plaintiff.  All dates and deadlines are stricken.  Civil case terminated.

Date: March 2, 2026

ENTERED:

John Robert Blakey
United States District Judge